**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 23-cr-20013-MSN-tmp |
| | ) |
| TERRY CURTIS, | ) |
| | ) |
| Defendant. | ) |

---

### REPORT AND RECOMMENDATION

---

Before the court by order of reference is defendant Terry Curtis's Motion to Suppress. (ECF No. 24.) For the reasons below, the undersigned recommends that the motion be denied.

### I.    PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the evidence presented at the suppression hearing. The evidence included the testimony of Detectives Andrew Sanford, Jaeger Zuck, and Joseph Rhoads, video of the defendant's statement while in police custody, two search warrants, and investigative photographs of the package at issue.

On April 7, 2022, Detective Sanford, a narcotics detective with the Shelby County Sheriff's Department and certified drug detection K-9 handler, was conducting routine observations at a Shelby County Federal Express Corporation ("FedEx") distribution

facility. (ECF No. 24 at PageID 42; ECF No. 30 at PageID 58.)
Sometime between 6:00 a.m. and 6:30 a.m., Detective Sanford
retrieved a package from the processing belt after noticing the
manner in which it was sealed. (ECF No. 24 at PageID 42; ECF No.
30 at PageID 58–59; Tr. pp. 5, 27.) The package was mailed from
someone who provided only a first name, had tape covering all of
the open seams, was shipped from Carlsbad, California, and was
being sent to a residence. (ECF No. 24 at PageID 42; ECF No. 30 at
PageID 59; Tr. p. 6.) Images of the package and label are depicted
below:





(Ex. No. 5.) It was scheduled for delivery at 10:30 a.m. that
morning. (Tr. p. 13.) Detective Sanford testified that only about
ten percent of the packages that travel through the facility are
sent to residences instead of businesses and that these packages
have a higher likelihood of containing narcotics. (ECF No. 30 at
PageID 59; Tr. p. 6.) He also testified that taping all of the
creases is common for people who are trying to mask drug odors.

- 3 -

(Tr. p. 6.) Additionally, Detective Sanford testified that the package originated from Southern California and that when there is only a first name from the shipper, there is a higher likelihood that the package contains drugs. (Tr. pp. 5-6.) Detective Sanford did not check to see whether the addressee, "Courtney Sims," actually lived at the address. (Id. at pp. 23-24.) Detective Sanford placed the package in a caged-in area and, within ten minutes, brought his drug-sniffing dog, Abby, to that area. (ECF No. 24 at PageID 42; ECF No. 30 at PageID 60; Tr. pp. 7-9.) Abby made a positive alert for the scent of narcotics from the package. (ECF No. 24 at PageID 42; ECF No. 30 at PageID 60.)

Detective Sanford applied for and received a state search warrant for the package. (Id.) Upon execution of the warrant, Detective Sanford found inside the package several bags of suspected methamphetamine and one bag of suspected cocaine. (Id.) Detective Sanford then obtained an anticipatory search warrant for the residence at 3302 Spring Valley Cove in Memphis, where the package was heading. (ECF No. 24 at PageID 42; ECF No. 30 at PageID 61.) The warrant was authorized to be executed once the parcel was accepted "inside the residence." (ECF No. 30 at PageID 61.) Officers placed one bag of the suspected methamphetamine and the bag of suspected cocaine back into the parcel along with a tracking device and resealed it. (ECF No. 24 at PageID 42; ECF No. 30 at PageID 61.) An undercover officer delivered the package to 3302

Spring Valley Cove. (Tr. p. 54.) Upon arrival at 3302 Spring Valley Cove, officers saw an unidentified man working on a vehicle in the driveway. (ECF No. 24 at PageID 42.) It is undisputed that this man was the defendant, Terry Curtis. (Id.) The officers conducted a controlled delivery of the parcel to the front door; Curtis then took possession of the parcel and brought it inside the residence. (Id.; Tr. p. 55.) A few minutes later, as officers were conducting surveillance, they observed Curtis exit the residence with a black bag. (ECF No. 24 at PageID 42.) Curtis placed the black bag in the passenger seat of a black Mercedes and proceeded to drive away from the residence. (Id. at PageID 42–43.) At that time, officers conducted a traffic stop and found the delivered narcotics in the black bag. (ECF No. 24 at PageID 43.) In addition, Curtis was found to be in possession of $6,288. (Id.) Following Curtis's detention, officers executed the anticipatory search warrant for the house. (ECF No. 30 at PageID 60.) Inside the kitchen and primary bedroom, they found two firearms, pill presses, digital scales, suspected ecstasy pills/powder, and marijuana. (ECF No. 24 at PageID 43; ECF No. 30 at PageID 61–62.) Curtis's wife, who was also at the house, was taken into custody and officers secured their two children until Curtis's mother-in-law came to pick them up. (ECF No. 24 at PageID 43; Tr. pp. 32–33.)

Both Curtis and his wife were transported to the police station. (ECF No. 24 at PageID 43; ECF No. 30 at PageID 62.) At

some point, Curtis signed a Miranda rights waiver form. (ECF No.
30 at PageID 62; Tr. p. 46.) In an interview room at the police
station, Curtis spoke with Detectives Sanford and Rhoads. (ECF No.
24 at PageID 43; ECF No. 30 at PageID 62; Tr. p. 20.) Between eight
and nine minutes of the conversation were recorded on video. (Tr.
p. 21.) However, Curtis and the detectives likely spoke prior to
the start of the recording. (Id. at pp. 71–72.) The parties dispute
the length and content of the pre-recording conversation. (ECF No.
24 at PageID 43; ECF No. 30 at PageID 62.) Curtis claims that the
officers threatened to charge his wife and place his children into
state custody, and promised to release him if he confessed. (ECF
No. 24 at PageID 49.) Based on the officers' credible testimony,
the undersigned finds that the officers did not threaten Curtis
with placing his children into state custody or make promises to
him that he would be released if he confessed. (Tr. pp. 21, 37,
74.) In his recorded statement, Curtis admitted that the drugs and
pill presses located in the house and car were his. (Ex. No. 1.)
He also admitted he was receiving shipments of methamphetamine
every three weeks. (Id.) The officers asked whether Curtis felt he
had been treated fairly, to which he responded "yeah." (Id.) After
making these admissions, Curtis's wife was released without
charge. (ECF No. 24 at PageID 43; Tr. p. 40.) On January 19, 2023,
Curtis was indicted by a grand jury in the Western District of
Tennessee with possession of methamphetamine/fentanyl with intent

to distribute, possession of a firearm by a convicted felon, and possession of a firearm in furtherance of drug trafficking in Counts 5-10 of the indictment. (ECF No. 1.)

On May 3, 2023, Curtis filed a motion to suppress the evidence "found as a result of a search of a parcel sent to his residence via [FedEx], evidence found resulting from an anticipatory search warrant executed at his residence, and his verbal admission to detectives after he was taken into custody." (ECF No. 24 at PageID 41.) Curtis makes three separate claims. (ECF No. 24.) First, he contends that Detective Sanford lacked reasonable suspicion to remove the package for the purpose of conducting a canine sniff because "it appears that the only 'suspicious' characteristic of the package was that it was taped on all sides." (Id. at PageID 45.) He specifically takes issue with Detective Sanford's never having confirmed whether the address on the package matched the name. (Id.) Curtis reasons that because there were "no other articulable facts that would constitute reasonable suspicion justifying 'holding' the package for the K-9 to do the sniff[,]" the sniff was therefore illegal, and as a result, the initial warrant to search the package was defective. (Id.) Second, Curtis claims that the anticipatory search warrant for the house was "overly vague and did not adequately specify the 'triggering condition'[.]" (Id. at PageID 46.) Because the officers never investigated who lived at the house and the warrant was left

ambiguous, Curtis argues that the warrant was overly vague,
allowing officers "to execute the warrant as soon as any person
took the package inside the house." (Id. at PageID 47-48 (emphasis
in original).) Third, Curtis claims that his recorded confession
was "obtained through coercion and threats in violation of his
Fifth Amendment right against self-incrimination." (Id. at PageID
48.) Curtis alleges he was interrogated at the police station for
some time prior to giving his recorded statement. (Id. at PageID
49.) He contends that, during this conversation, he "denied any
knowledge of drug dealing or possession of narcotics" and only
confessed after "officers threatened to arrest the Defendant's
wife, have his children placed into state custody, and made
assurances to the Defendant that he could be released from custody
if he would confess." (Id.) He argues that this was sufficiently
coercive to overbear his will and that the coercion was a crucial
motivating factor in his decision to make his statement. (Id. at
PageID 50.)

    This motion was referred to the undersigned on May 12, 2023.
(ECF No. 25.) The government filed a response in opposition on
June 5, 2023. (ECF No. 30.) It argues that (1) there was sufficient
evidence for Detective Sanford to develop reasonable suspicion to
detain the package; (2) the triggering condition in the
anticipatory search warrant was sufficient to establish probable
cause; and (3) the officers did not interrogate Curtis prior to

advising him of his <u>Miranda</u> rights, no threats or promises were made, and his post-<u>Miranda</u> statement was not the product of any police coercion. (<u>Id.</u>)

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Reasonable Suspicion to Detain the Package

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "It has long been held that first-class mail such as letters and sealed packages subject to letter postage . . . is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment." <u>United States v. Van Leeuwen</u>, 397 U.S. 249, 251 (1970); <u>see also</u> <u>United States v. Jacobsen</u>, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy[.]"). However, as the Supreme Court held in <u>Van Leeuwen</u>, "even first-class mail is not beyond the reach of all inspection[.]" 397 U.S. at 251. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967). "'Thus, the Fourth Amendment is not implicated when only external features of a package, like the address label[,] are examined; there is no reasonable expectation of privacy that the outside of a package given to a mail-carrier will be kept

private.'" <u>United States v. Johnson</u>, 25 F. Supp. 3d 1034, 1038 (W.D. Mich. 2014) (quoting <u>United States v. Hoang</u>, 486 F.3d 1156, 1159-60 (9th Cir. 2007)). The Sixth Circuit has held that "only reasonable suspicion, and not probable cause, is necessary in order to briefly detain a package for further investigation, such as examination by a drug-sniffing dog." <u>United States v. Robinson</u>, 390 F.3d 853, 870 (6th Cir. 2004). Additionally, "[t]he reasonableness of an official invasion of [a] citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." <u>Jacobsen</u>, 466 U.S. at 115.

Whether there was the requisite reasonable suspicion for police to detain a package for the purpose of subjecting it to a canine sniff is a fact intensive inquiry, with the focus being on the condition of the package and the label. As the Sixth Circuit has explained,

> [i]n combating the transportation of narcotics through the mails, the Postal Service has developed a "drug package profile," which targets packages based on certain traits encountered in the vast majority of mailings discovered to contain drugs. These characteristics include: (1) the size and shape of the mailing; (2) whether the package is taped to seal all openings; (3) whether the mailing labels are handwritten; (4) whether the return address is suspicious (e.g., the return addressee and the return address do not match, or the return address is fictitious); (5) unusual odors coming from the package; (6) whether the city of origin and/or city of destination of the package are common "drug source" locales; and (7) whether there have been repeated mailings involving the same sender and addressee.

United States v. Underwood, Nos. 95-5441, 95-5442, 1996 WL 536796,
at *3 (6th Cir. 1996) (citing United States v. Daniel, 982 F.2d
146, 150 n.5 (5th Cir. 1993) and United States v. Lux, 905 F.2d
1379, 1380 n.1 (10th Cir. 1990)). The undersigned has
comprehensively surveyed Sixth Circuit case law pertaining to the
application of the reasonable suspicion standard to the detention
of mailed packages for the purpose of conducting further
investigation. These cases have considered all of these factors in
consistently finding circumstances sufficient to establish
reasonable suspicion. See, e.g., United States v. Ligon, 861 F.
App'x 612, 620 (6th Cir. 2021) (affirming conviction and finding
reasonable suspicion to detain package where investigation
revealed that the recipient and return addresses were not
associated with the names of the sender and recipient; the package
was sent via Priority Mail; the package was sent to Cleveland,
Ohio with a return address in Modesto, California, both of which
were considered drug hotspots; the size of the package was
suspicious; and the investigator had "experience investigating
drug trafficking"); United States v. Alexander, 540 F.3d 494, 501
(6th Cir. 2008) (affirming district court finding of reasonable
suspicion to detain a package where investigation revealed that
the return address was fake; the package was sent via Express Mail;
the return address was in Las Vegas, Nevada, which is near the
border with Mexico and considered a drug source city; the label

- 11 -

was handwritten and the signature line marked only with an "X";
and the package was dense); Robinson, 390 F.3d at 869–70 (affirming
conviction and finding reasonable suspicion to detain package
where the parcel smelled of marijuana; the label was handwritten;
and the return address was to "known drug distribution area"
Inglewood, California); United States v. Elgin, 57 F. App'x 659,
661 (6th Cir. 2003) (affirming district court finding of reasonable
suspicion to detain a package where investigation revealed that
the return address was fake; the package was sent via Express Mail;
it was "mailed from a city that was known to be a common source of
illegal drugs"; and "three other packages had been mailed to the
same address that also contained fictitious return addresses");
Underwood, 1996 WL 536796, at *3 (finding reasonable suspicion to
detain package where investigation revealed that the recipient's
name was fake, the return addresses on the two packages were fake,
and the listed phone numbers did not exist; the package was sent
via Express Mail; the return address was in Long Beach, California,
a drug source city; three similar suspicious parcels came through
the facility in the preceding eight months; "the destination of
the parcels—to individuals—was unusual in that most Express Mail
packages are sent to businesses"; the labels were handwritten and
"although all of the packages purported to be from different
persons and different locations, the labels appeared to have been
prepared by the same person"; the recipient had a prior criminal

record; and the packages had some "volume to them"); United States
v. Guzman, No. 2:22-CR-20, 2023 WL 3773344, at *3–4 (W.D. Mich.
June 2, 2023) (finding reasonable suspicion to detain package where
investigation revealed that the return address was fake; the police
were tipped off by two confidential informants; the labels were
handwritten; the return addressee and recipient on the package did
not have listed first names — "A. Soli" and "G. Baez,"
respectively; and the envelope had a bulge consistent with drug
containers); United States v. Sherrell, No. 5:20CR172, 2021 WL
5768078, at *1–3 (N.D. Ohio Dec. 6, 2021) (finding reasonable
suspicion to detain package where investigation revealed that the
recipient's name was fake; a tip from a confidential informant
provided a "particularized" tracking number; the sender's address
was in California, "a noted source state for narcotics"; and the
investigator had eighteen years of experience); United States v.
Ferguson, No. 3:20-CR-018, 2021 WL 4848046, at *1, *4 (S.D. Ohio
Oct. 18, 2021) (finding reasonable suspicion to detain package
where there was "excessive tape" including over the seams; it was
shipped from San Bernardino, California, a "known drug source
location" and the recipient's zip code was "known to receive
narcotic packages"; the recipient's name was crossed out and
rewritten; the label was handwritten; the package was sent via
Priority Mail; the payment was made in cash; and, after further
investigation, investigators discovered that "neither name was

- 13 -

associated with the respective address and . . . the sender street did not exist"); United States v. Butler, No. 21-20235, 2021 WL 3401222, at *1-2, *4-5 (E.D. Mich. Aug. 4, 2021) (finding reasonable suspicion to detain package where investigation revealed that the names of the senders and recipients did not match the addresses listed on the packages; both packages were shipped via Priority Mail and weighed far more than the standard less-than-two-pound parcel weight; the labels were handwritten; neither package had a business account number making it more likely that payment was made by cash; and the destination "was, according to the inspectors' professional knowledge, a common delivery point for illegal narcotics"); United States v. Ickes, No. 1:15-CR-00004, 2016 WL 1448877, at *2 (W.D. Ky. April 12, 2016) (finding reasonable suspicion to detain package where investigation revealed that the recipient and return initials on the package did not match their respective addresses on file; the package was shipped via Express Mail, which "is a common practice for the shippers of controlled substances . . . because the drugs or monies arrive faster and on a predictable date"; it was sent from a source state; the "post office location from which the package originated was not the post office location that regularly services the return address"; the Signature Required box was not checked; the label did not have a phone number; and "the package [was] addressed from a person to a person, something that is unusual with Express Mail

- 14 -

mailings"); <u>Johnson</u>, 25 F. Supp. 3d at 1039 (finding reasonable suspicion to detain package where investigation revealed that the return address was fake; the package weighed more than eight ounces; the label was handwritten; there was no business account number; it was addressed from individual to individual; and it was mailed from Phoenix, Arizona, "a known narcotic mailing source location"); <u>United States v. Floyd</u>, 247 F. Supp. 2d 889, 895-96 (S.D. Ohio 2002) (finding reasonable suspicion to detain package where investigation revealed that the return address appeared to be fake; there had been prior shipment of a similar package containing controlled substances; the package was mailed through Express Mail; the sender paid cash for the shipment; and it was shipped from San Diego, California, "a known source for drugs"); <u>see also</u> <u>Van Leeuwen</u>, 397 U.S. at 249-50, 252 (reversing the circuit court and finding reasonable suspicion to detain package where the return address was a vacant housing area; the package was sent via First Class mail; the shipping location was Mt. Vernon, Washington, near the U.S.-Canada border; the defendant's license plate was from British Columbia; and the parcel weighed 12 pounds); <u>United States v. Dennis</u>, 115 F.3d 524, 532-33 (7th Cir. 1997) (finding reasonable suspicion to detain package even where police did not investigate the names or addresses of the sender or recipient but where the package was heavily taped; it had been mailed from one individual to another individual; it had been sent

from Los Angeles, California, "a city known to be a source city for narcotics distribution"; it "had been mailed from a zip code different than the zip code listed in the return address"; and the inspector had five years of experience). These cases demonstrate that the threshold for meeting the reasonable suspicion standard, as applied to the detention of packages for the purpose of subjecting them to dog sniffs, is a low one.

Indeed, the undersigned could find only a few cases from any circuit where a court found that investigators lacked reasonable suspicion to detain a package for further investigation. The case most cited is United States v. Johnson, where the Eighth Circuit suppressed the seized and searched package despite the fact that it (1) was mailed from one individual to another individual at the same address; (2) had a handwritten label; (3) was mailed from California, a drug source state; (4) had a different return zip code from the recipient zip code; and (5) the investigator was experienced at evaluating these factors. 171 F.3d 601, 604 (8th Cir. 1999). The Eighth Circuit noted that

> [t]he inspector did not testify at the suppression hearing and his affidavit did no more than state that he had eight years of experience as a postal inspector along with some training courses, and that the package in question met the Express Mail/Narcotics Profile.

Id. The court held that the listed "particularized facts, when considered individually and in combination, [did] not support a finding of reasonable suspicion of criminal activity to warrant

- 16 -

the interception and detention of the package sent by appellant."
Id. However, the court emphasized that it was not stating that
this combination of factors could never be enough, but instead
that "the record [did] not contain any particularized assessment
of their significance for purposes of determining reasonable
suspicion." Id. at 605. The court hinted that, had the investigator
been present at the suppression hearing to provide justifications
for his decisions or had the government produced evidence to show
its reasoning behind each of the Narcotics Profile factors, the
outcome might have been different. See id.

    In United States v. Poor, a case from the Sixth Circuit, the
investigator received a call from a FedEx facility regarding two
"suspicious" packages and requested that employees detain the
package until his arrival. No. 5:11-CR-114-KKC-REW, 2012 WL
1153474, at *1 (E.D. Ky. Mar. 12, 2012), report and recommendation
adopted, No. 5:11-CR-114-KKC, 2012 WL 1153324 (E.D. Ky. Apr. 5,
2012). He "learned **only** that FedEx had some concern, not now
articulable by [the investigator], and that the packages were
heading to distinct Garrard County addresses." Id. (emphasis in
original). The court determined that because the investigator had
not seen the packages and had no other information before
requesting the packages' detention, he did not have reasonable
suspicion to detain them. Id. at *5-6. Similarly, in United States
v. Gerace, law enforcement agents requested that UPS detain

- 17 -

packages destined for a company suspected of running a shipping scam. No. 00-CR-009S(SR), 2002 WL 1334818, at *4 (W.D.N.Y. Jan. 10, 2002). The court found that "nothing in the record . . . suggests that there was anything inherently suspicious about the packages . . . . The Task Force members did not explain the connection between their knowledge of [the company's] prior practices and the packages detained by UPS." Id. at *10. Because the agent "simply made a conclusory statement, that '[she] knew what was in there were fruits of the crime [sic],' but failed to explain how she developed reasonable suspicion that these particular packages were suspect[,]" the evidence collected was suppressed for lack of reasonable suspicion. Id. (alterations in original).

It is well established that "[r]easonable suspicion requires more than a 'mere hunch,' but 'less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'" Hoover v. Walsh, 682 F.3d 481, 494 (6th Cir. 2012) (quoting United States v. Campbell, 549 F.3d 364, 370-71 (6th Cir. 2008) (internal quotes omitted)). Yet, as the above survey of Sixth Circuit cases demonstrates, the requisite weight of articulable facts deemed sufficient for reasonable suspicion is substantially lower to detain a postal package than to detain a person. For example, when evaluating whether an officer has an adequate level of suspicion to frisk a person for weapons, substantially more

articulable facts are required. See Terry v. Ohio, 392 U.S. 1, 27
(1968) ("[D]ue weight must be given, not to [the officer's]
inchoate and unparticularized suspicion or 'hunch,' but to the
specific reasonable inferences which he is entitled to draw from
the facts in light of his experience."); Fam. Serv. Ass'n ex rel.
Coil v. Wells Twp., 783 F.3d 600, 604 (6th Cir. 2015) ("Walking
away from an officer without answering his questions or revealing
one's name does not establish reasonable suspicion for a Terry
stop. And an individual's late-night presence in a high-crime area
by itself does not establish reasonable suspicion of anything other
than the probability that the individual lives in a high-crime
area."); United States v. Keith, 559 F.3d 499, 503 (6th Cir. 2009)
("Reasonable suspicion does not materialize merely because a
person 'looked suspicious' and was in a 'high drug problem area.'")
(quoting Brown v. Texas, 443 U.S. 47, 49, 52 (1979)); United States
v. Davis, 554 F. App'x 485, 489 (6th Cir. 2014) (When "officers
pulled into a well-lit gas station around midnight and saw a man
walking at a normal pace back toward the gas station door, which
was same direction the officers were traveling" and the man was
making "furtive hand movements in and out of his bulging pocket[,]"
there were sufficient, reasonable, alternative explanations for
his actions that did not give rise to reasonable suspicion.").

Likewise, more facts are required to establish reasonable
suspicion when an officer conducts a traffic stop. See United

States v. Warfield, 727 F. App'x 182, 187 (6th Cir. 2018) (finding
that police did not have reasonable suspicion to pull over a person
alleged to be drunk driving when he "touched the lane lines on two
occasions and slightly drifted within his lane" while also weaving
slightly); United States v. See, 574 F.3d 309, 314 (6th Cir. 2009)
(finding no reasonable suspicion even when "(1) it was 4:30 a.m.;
(2) the men were parked in a high-crime area; (3) before beginning
his shift, [the officer] had been instructed to pay special
attention to non-resident loiterers because of a recent increase
in robberies; (4) there were three men in the car; (5) the car's
interior light was off; (6) the car was parked away from the
apartment building in a dim portion of the lot; and (7) the car
did not have a front license plate."); United States v. Bell, 555
F.3d 535, 540 (6th Cir. 2009) (finding no reasonable suspicion to
extend a traffic stop when "(1) Bell repeated the same story and
sounded rehearsed; (2) Bell moved too quickly for the rental
agreement; (3) Bell was holding a cell phone; (4) Bell did not
make eye contact with Trooper Roberts; (5) Bell was overly
respectful and cooperative; (6) Bell did not have written
permission to operate the rental car; and (7) Sergeant Helton
observed Bell's exaggerated body movements while in the
vehicle.").

    Even though the Eighth Circuit found no reasonable suspicion
to detain a package in Johnson, the court nevertheless implied

that reasonable suspicion could have been met had the police explained their reasoning. 171 F.3d at 605. The remaining examples, Poor, 2012 WL 1153474, and Gerace, 2002 WL 1334818, involved situations where the police provided no reasoning whatsoever. These cases undoubtedly demonstrate that there remains a "legitimate expectation of privacy" in "[l]etters and sealed packages[,]" Jacobsen, 466 U.S. at 114, but the articulable facts necessary to establish reasonable suspicion to detain them are notably lower than in just about any other circumstance.

Here, Detective Sanford testified that he had three years of experience investigating suspicious packages. He said that what caught his eye about the package in question was tape along all the seams, it came from Carlsbad, California, and it was labeled only with the first name of the sender. (Ex. No. 5.) During the September 27 hearing, Detective Sanford explained that taping every crease is designed "to keep the odors inside the box." Additionally, he explained that he looks for packages that come from the West Coast, including Southern California. This region, as the government described in its brief, is "a source area for narcotics[.]" (ECF No. 30 at PageID 66.) Further, the sender was only identified as "Douglas." Detective Sanford testified that, when shipping narcotics, people will "do that sometimes" and, more generally, "[t]hey always" use a fake name. Detective Sanford identified several other details he claims caused him to be

- 21 -

suspicious, but the undersigned questions their role in the detective's evaluation at the time he detained the package. Unlike what appears to be standard practice in almost any other package detention case, Detective Sanford did not conduct a search of the names or addresses of either the sender or receiver. There is insufficient evidence to suggest that Detective Sanford knew whether the package was being sent to a house or a business, as he claims. Therefore, his reasoning that only "maybe 10 percent of" packages being shipped to residential addresses made him more suspicious of its contents is not supported.

There are innocent explanations for each of the factors that Detective Sanford described: the tape on the box was far from "excessive" and many individuals shipping personal items are likely to put that much, if not more, tape on their packages; San Bernardino is a city of hundreds of thousands, and Southern California has millions of people, plenty of whom are shipping innocuous items around the country; and there are valid reasons why a sender might not put their entire name on the label, such as if they are mailing a package to a person who knows them well. But "[e]ven where each factor cited by law enforcement to support a seizure is 'not by itself proof of any illegal conduct and is quite consistent with innocent' activity, the sum of the factors taken together can amount to reasonable suspicion." Ferguson, 2021 WL 4848046, at *4 (quoting United States v. Sokolow, 490 U.S. 1, 9

- 22 -

(1989)). The sum of the factors Detective Sanford described and articulated justifications for, combined with his experience, is sufficient to meet the reasonable suspicion standard required to detain the package in anticipation of a dog sniff. See Dennis, 115 F.3d at 532–33. Therefore, the resulting search warrant to search the package was not obtained in violation of Curtis's Fourth Amendment rights, and the evidence from the parcel should not be suppressed.

B.    **Validity of the Anticipatory Search Warrant**

Curtis argues that the triggering condition of the anticipatory search warrant was "too vague to establish probable cause." (ECF No. 24 at PageID 47.) He claims the officers did not ascertain whether the man seen during the surveillance was Curtis, nor did they investigate who lived at the delivery address. Id. And, the triggering condition could have included more specific language requiring the undercover delivery agent to hand the package directly to Curtis before executing the warrant. Id. Curtis argues that the triggering condition was intentionally left vague to allow officers to execute the warrant as soon as any individual took the package inside the home. Id.

The government counters with the following: the triggering event was specific in that probable cause was based upon the package being accepted inside the residence. (ECF No. 30 at PageID 67.) Probable cause is associated with the place and not the name

of the target. (Id.) Because fictitious names are often used by drug traffickers when shipping packages, the triggering event was not tied to a specific individual accepting the package. (Id.) Rather, the probable cause would be generated upon acceptance of the package into the specific residence. (Id.)

To establish probable cause for an anticipatory search warrant, a "triggering condition" must occur. United States v. Perkins, 887 F.2d 272, 274 (6th Cir. 2018) (citing United States v. Grubbs, 547 U.S. 90, 94 (2006)). The judicial officer must ensure that the triggering condition for an anticipatory search warrant be "explicit, clear, and narrowly drawn." Id. at 275 (quoting United States v. Miggins, 302 F.3d 384, 395 (6th Cir. 2002)). "[F]ailure to comply with an anticipatory warrant's triggering event void[s] the warrant." Id. (internal quotation marks omitted) (citing United States v. Rey, 923 F.2d 1217, 1221 (6th Cir. 1992)). The issuing judicial officer must determine whether probable cause supports the anticipatory search warrant, thus "the [judicial officer] must be sure what the triggering event is and that it will establish probable cause." Id. However, as the Supreme Court has said, a triggering condition as generic as receipt "by a person(s) and . . . physically taken into the residence" followed by "successful delivery . . . would plainly establish probable cause for the search." Grubbs, 547 U.S. at 92, 96.

Here, the triggering event is written in the warrant as "acceptance inside the residence." (Ex. No. 4.) The warrant lists "Courtney Simms, Persons, Persons Unknown" as the occupants of 3302 Spring Valley Cove but does not specify whose acceptance of the package will actually trigger the warrant's execution. (Ex. No. 4.) The undersigned finds that the triggering event is explicit, clear, and narrowly drawn, and that it was satisfied when the package was brought inside 3302 Spring Valley Cove. Like in Grubbs, the anticipatory warrant was therefore supported by probable cause. Thus, there is no need to analyze whether the officers were acting in good faith when they executed the warrant.

## C.    **Whether Curtis's Confession was Coerced**

Curtis contends that his confession was coerced and involuntarily given. (ECF No. 24 at PageID 48.) Specifically, he argues that "officers threatened to arrest the Defendant's wife, have his children placed into state custody, and made assurances to the Defendant that he could be released from custody if he would confess[,]" his will was overborne and therefore his subsequent statements should be suppressed. (Id. at PageID 49–51.) The government posits instead that it did not question Curtis outside of the video recording and the police questioning never reached a level sufficient to overbear his will. (ECF No. 30 at PageID 14–15.) The Sixth Circuit has held that there are

three requirements for a finding that a statement was
involuntary due to police coercion: (i) the police
activity was objectively coercive; (ii) the coercion in
question was sufficient to overbear the defendant's
will; and (iii) the alleged police misconduct was the
crucial motivating factor in the defendant's decision to
offer the statement.

United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (citing

McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)).

However, not all psychological tactics are
unconstitutional. In determining whether a confession
has been elicited by means that are unconstitutional,
this court looks at the totality of the circumstances
concerning "whether a defendant's will was overborne in
a particular case." Factors to consider in assessing the
totality of the circumstances include the age,
education, and intelligence of the accused; whether the
accused has been informed of his constitutional rights;
the length of the questioning; the repeated and
prolonged nature of the questioning; and the use of
physical punishment, such as the deprivation of food or
sleep.

Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

First, the "threats" that Curtis alleges were made regarding

his wife are insufficient to be considered "objectively coercive."

If the threat of prosecution against a family member could have

been "lawfully executed[,]" it is not considered objectively

coercive. United States v. Johnson, 351 F.3d 254, 263 (6th Cir.

2003). And, whether police could have lawfully arrested a suspect's

spouse "depends on whether the investigating officers had probable

cause to suspect [the spouse] of criminal involvement." Id. Because

the narcotics were found in the kitchen, a common area of the home,

and because the police were not aware of who the owner was, they had probable cause to detain Curtis's wife for questioning and further investigation. Thus, there was nothing inaccurate or objectively coercive about any police communication to Curtis that his wife was in police custody and might be charged.

Curtis's remaining arguments rely on conversations with the police officers that he alleges occurred prior to the recorded statement. The government asserts that the officers did not interview Curtis prior to the "8 minute[] and 20 second[]" recording. (ECF No. 30 at PageID 72.) However, Detective Rhoads admitted that they "might have discussed" things with Curtis prior to taking the recorded statement. (Tr. pp. 71-72.) But as stated above, there is no evidence that the officers discussed Curtis's children or provided him some assurance that he would be released if he confessed. He does not allege that he was deprived of food, water, or sleep. (ECF No. 24 at PageID 49.) When asked if he felt he had been treated fairly, Curtis said "yeah." (Ex. No. 1.) Based on the totality of the circumstances, Curtis's statements were not the product of police coercion. Therefore, the recorded confession should not be suppressed.

### III. RECOMMENDATION

For the reasons above, it is recommended that Curtis's Motion to Suppress be denied.

Respectfully submitted,

s/Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

November 8, 2023
Date

**NOTICE**

**NOTICE WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**